# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

JESSIE ENGLES,

Plaintiff,

v.                                                                      9:14-CV-1214
                                                                        (TJM/ATB)

CHRIS BENNETT and
BRIAN DOUGHERTY.,

Defendants.

JESSIE ENGLES, Plaintiff, pro se
TIMOTHY P. MULVEY, Asst. Attorney General for Defendants

ANDREW T. BAXTER
United States Magistrate Judge

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the

Honorable Thomas J. McAvoy, Senior United States District Judge.  In this civil rights

complaint, plaintiff alleges that defendant Bennett subjected him to excessive force,

defendant Dougherty denied plaintiff constitutionally adequate medical care, and both

defendants retaliated against plaintiff for filing grievances.[1] (Complaint ("Compl.")

(Dkt. No. 1).

Presently before the court is defendants' motion for summary judgment pursuant

to Fed. R. Civ. P. 56. (Dkt. Nos. 33, 34, 85).  Plaintiff has filed a response in opposition

to the motion. (Dkt. No. 84).  For the following reasons, this court agrees with

---

[1] These are the remaining issues against the remaining defendants in this case.  Four of the
original defendants were dismissed by order of Senior Judge McAvoy on February 12, 2015. (Dkt. No.
5).

defendants in part and will recommend dismissal of all claims except the excessive force claim against defendant Bennett.

## I.   Facts

The court will briefly summarize the remaining relevant facts as stated in plaintiff's complaint. Plaintiff alleges that, on December 30, 2011, at approximately 9:00 a.m., he heard corrections officers "screaming" at another mental health patient ("Inmate T"), who was housed with plaintiff in the Residential Mental Health Unit ("RMHU") at Marcy Correctional Facility. (Compl. ¶ 1). Plaintiff states that he stood close to his "gate" so that he could listen to what the officers were saying and so that he could be a "witness" to any "misconduct" by the staff. (*Id.* ¶ 2).

Plaintiff claims that he heard one of the officers tell Inmate T that if he did not pack his things so that the officers could move him to another cell, the officers would be forced to "extract" him. (Compl. ¶ 3). According to plaintiff, Inmate T was attempting to explain to the officers that he had some property that plaintiff was holding for him, and he had to retrieve that property before moving to a different part of the facility. (*Id.*) The officers denied Inmate T's request, and he continued to resist the cell move. (*Id.*) Inmate T told the officers to go "suit up" for extraction. (Compl. ¶ 4).

At this point, plaintiff admits that he "tried to talk to [Inmate T]" in an "attempt" to explain his "constitutional rights" to him. (Compl. ¶ 5). Plaintiff began telling Inmate T that, according to "staff procedures," the officers were required to offer him the chance to speak with an Office of Mental Health ("OMH") counselor before they could "extract" Inmate T from his cell. (Compl. ¶ 6). Plaintiff told Inmate T that, after he spoke to the OMH counselor and complied with the cell change, plaintiff would try

to get Inmate T his belongings "another way." (*Id.*)

Plaintiff claims that as he was speaking to Inmate T, defendant Bennett "snuck[] up along the wall cell door area [and] slamed [sic] the cell shield closed on my fingers." (Compl. ¶ 7). Plaintiff states that, when the cell shield got "jammed" in his fingers, defendant Bennett pulled the shield back so that plaintiff could remove his hand. (*Id.*) Plaintiff states that, as a result of defendant Bennett's conduct, plaintiff's middle finger was "cut deep enough to see torn meat & ligaments & the white meat which I believe was my bone." (Compl. ¶ 8). Plaintiff states that he showed his injury to defendant Bennett and requested to be seen by the medical staff and to speak with an OMH counselor. (Compl. ¶ 9). Plaintiff claims that defendant Bennett denied him these requests. (*Id.*)

Plaintiff claims that he "screamed" for "a medical emergency" and "an OMH counselor" for "over an hour," but nothing was being done. Plaintiff alleges that he even told one of the former defendants when he made his "round," but he "still did nothing about it." (Compl. ¶ 10). Plaintiff claims that, in order to get someone to notice him, he waited for the noon meal trays to be served and then placed a hard cover book in the "feed up portal area," so that someone would try to "get the feed up area closed."[2] (*Id.*)

Plaintiff alleges that, after another thirty minutes, someone escorted him to the nurses' station, where he was seen by a "Jane Doe" nurse, who "waived all professional

---

[2] Plaintiff's theory appears to be that, if he jammed the feed up door open with his book, then someone would have to come and try to get it closed, and this could help him obtain medical care for his finger, although he would risk getting a misbehavior report for blocking the door. However, plaintiff alleges that the "same" officers were serving the meal trays, and the higher ranking officers were "trying to cover up this incident." (Compl. ¶ 10).

judgment," by stating "on camera," that plaintiff's wound was only "superficial" and did not need any stitches. (Compl. ¶ 11). The Jane Doe nurse stated that the wound only needed to be "cleaned [and] bandaged up." (*Id.*) Plaintiff states that he believes that the nurse was instructed by "DOCCS prison officials . . . to prevent the seriousness of [his] injuries to be properly noted on the record." (*Id.*)

Plaintiff was placed in a "holding pen" so that Jane Doe nurse could clean plaintiff's finger. (Compl. ¶ 12). Plaintiff asked the officers if this incident would prevent him from attending OMH "programming," and plaintiff claims that the officers said that the incident would not prevent programming as long as plaintiff did not engage in any "violent" conduct. (*Id.*) Plaintiff claims that, as he saw another inmate pass by his holding area, plaintiff asked him to please write to the Inspector General's Office and "tell them of my incident today, because the Jane Doe medical nurse is [trying not to] give me proper medical[] treatment." (Compl. ¶ 13). Plaintiff claims that he told the other inmate that the incident should be investigated because the prison officials were tampering with his mail. Finally, plaintiff states that he asked the other inmate to "request that the video cameras of this incident areas [sic] be preserved for further legal action." (*Id.*)

Plaintiff claims that when he was taken back to his cell, former defendant Snyder told plaintiff that he was denying him "the right" to attend four hours of OMH programming due to his request to the other mental health patient. (Compl. ¶ 14). Plaintiff states that the officer told him that his conduct in asking another inmate to write to the Inspector General was an act that could "incite a riot" or "become a problem." (*Id.*) Plaintiff states that when he got back to his cell, he did not comply with

the officers' order to allow the officers to take off plaintiff's handcuffs "because of [his] past experience with them." (Compl. ¶ 15).  Plaintiff speculates that once the handcuffs were taken off, and he was secured in his cell, the officers would be free to ignore his requests for help, until plaintiff was able to hurt himself.

Plaintiff states that an OMH nurse came to his cell, and plaintiff informed the nurse what triggered plaintiff's anger, but the nurse's only concern was getting plaintiff to allow the officers to take off the handcuffs. (Compl. ¶ 16).  Plaintiff told the nurse that the handcuffs were staying on until they took plaintiff to a strip cell, because he was going to hurt himself. (*Id.*)  Plaintiff finally gave up the handcuffs and he states that he waited two hours to be taken to the strip cell. (Compl. ¶ 18).  Plaintiff states that defendant Dougherty came to the strip cell later that day to give plaintiff his pain killers.  Plaintiff showed defendant Dougherty his finger injury and "asked him for his medical decision regarding such and to do the right thing in helping [plaintiff] get it treated properly. (*Id.*)

Plaintiff claims that defendant Dougherty asked plaintiff what the prior nurse had told him when she cleaned the wound. (Compl. ¶ 19).  Plaintiff told defendant Dougherty that the prior nurse told plaintiff that it "was only a superficial laceration," but plaintiff believed that the prior nurse was wrong, and that his finger needed to be "stitched up." (*Id.*)  Plaintiff told defendant Dougherty that Nurse Doe "had clearly denied [plaintiff] proper medical treatment."  Nurse Dougherty allegedly became "sarcastic" and stated that "well now you want me to help you after all those times you wrote me up in your grievances." (*Id.*)

Plaintiff claims that he told defendant Dougherty that plaintiff was just telling

5

him to do his job, and that if he did not deprive plaintiff of medical care "in the first place," there would have been no "issues" about which to write grievances. (Compl. ¶ 20). Nurse Dougherty allegedly told plaintiff to "have a nice time trying to get your finger treated . . . ." Plaintiff then threatened to sue defendant Dougherty for his "negligence" in failing to treat plaintiff's injuries. (*Id.*) Plaintiff claims that defendant Dougherty became angry and told plaintiff that he did not care what he filed. (Compl. ¶ 21). Plaintiff claims that his conversation with defendant Dougherty was caught on video tape, and that plaintiff would be filing a Freedom of Information Law request to "preserve" the videotape. Defendant Dougherty allegedly implied that he knew plaintiff would not get a response to that request. (Compl. ¶¶ 21-22). Defendant Dougherty then left the area. (*Id.*)

Plaintiff states that between 6:00 p.m. and 7:00 p.m., defendant Dougherty came to plaintiff's cell to give plaintiff his asthma pump, but should not have left it with plaintiff in the strip cell based upon plaintiff's threats of self-harm. (Compl. ¶ 23). Plaintiff claims that, as a result, he broke the asthma pump and tried to cut his wrists with it. (*Id.*) When he was unsuccessful in cutting his wrists, he put the broken pieces of the pump in his anus "until [he] could break it down small enough to swallow, or get sharper to do more damage to [his] wrist." (*Id.*)

Plaintiff alleges that he showed his finger injury to the nurse on the "11-7" shift, and he agreed that plaintiff needed stitches, so plaintiff was sent to an outside hospital, where the doctor allegedly told plaintiff that the cut "was not . . . [a] superficial wound, and it did need stitches." (Compl. ¶ 25). The doctor then stitched plaintiff's finger, and he was returned to the "dry cell" at Marcy. (Compl. ¶ 25). Plaintiff states that he

continued to be harassed by other officers, and he was not provided with psychotropic medications,[3] "which led to numerous misbehavior reports being issued." (Compl. ¶ 26).

## II. **Summary Judgment**

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining

---

[3] Plaintiff does not allege that any particular individual was responsible for denying him "psychotropic" medications, and these allegations are not part of the claim against defendant Dougherty.

whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

## III.  Excessive Force

### A.    Legal Standards

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992).  To sustain a claim of excessive force, a plaintiff must still establish the objective and subjective elements of an Eighth Amendment claim.  *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999).

In order to satisfy the objective element of the constitutional standard for excessive force, a defendant's conduct must be "'inconsistent with the contemporary standards of decency.'"  *Whitely v. Albers*, 475 U.S. 312, 327 (1986) (citation omitted); *Hudson*, 503 U.S. at 9.  The malicious use of force to cause harm constitutes a per se Eighth Amendment violation, regardless of the seriousness of the injuries.  *Blyden*, 186 F.3d at 263 (citing *Hudson*, 503 U.S. at 9).  "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (citations omitted). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'"  *Sims*, 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of

culpability, shown by actions characterized by wantonness." *Id*. at 21 (citation omitted). The Supreme Court has recently re-emphasized that the "core judicial inquiry" is not whether a certain quantum of injury was sustained, but rather whether the force was applied in a good faith effort to restore discipline, or whether it was applied maliciously to cause harm, regardless of the seriousness of the injury. *Wilkins v. Gaddy*, __ U.S. __, 130 S. Ct. 1175 (2010).

In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003). The extent of the injury may be considered as one factor in determining whether the use of force could plausibly have been thought "necessary" in a particular situation. *Wilkins v. Gaddy*, 130 S. Ct. at 37-38, 40. The extent of the injury may also give some indication of the amount of force applied and may ultimately be considered in determining damages if appropriate. *Id.*

## B. Application

Plaintiff alleges that defendant Bennett intentionally slammed the "cell shield"[4] on plaintiff's hand, injuring his finger. (Compl. ¶ 7). Defense counsel cites a case in which the defendant's action in fracturing the plaintiff's foot by slamming the cell door

---

[4] There is no indication of the size or weight of the cell shield. The parties' papers do not contain any description of this opening.

on it during court did not violate "standards of decency." (Def.s' Mem. of Law at 5) (citing *Reid v. Nassau County Sheriff's Dep't*, No. 13-CV-1192, 2014 WL 4185195, at *23 (E.D.N.Y. Aug. 20, 2014).

In *Reid*, plaintiff Cazares[5] claimed that "an unidentified correction officer intentionally 'bang[ed] the cell door on [his] foot.'" *Reid*, 2014 WL 4185195 at *23 (alterations in original). The *Reid* court held that, based on plaintiff Cazares's allegation that the corrections officers banged on the cell doors every morning as a means of waking the inmates up, there were no allegations in the complaint "from which it may reasonably be inferred that, by banging the cell doors, the John Doe Corrections Officer . . . acted maliciously or sadistically to cause Cazares harm." *Id.* at *24. The court concluded that the complaint failed to state a plausible section 1983 excessive force claim. *Id.*

*Reid* is distinguishable from this plaintiff's case. The incident in *Reid* was a non-specific incident, and one which Mr. Cazares claimed happened on a regular basis to wake up the inmates. Plaintiff in this action has identified the defendant who he alleges slammed the cell shield on his hand and has also identified an allegedly malicious reason for doing so. Plaintiff admits that he was explaining "rights" to another inmate, who defendant Bennett was attempting to move into a different cell. Plaintiff alleges that while he was attempting to speak to Inmate T through the cell door opening, defendant Bennett "snuck" up and intentionally slammed the cell shield on plaintiff's hand. The complaint may be interpreted to claim that defendant Bennett undertook this

---

[5] The court notes that *Reid* involved many plaintiffs with many issues and a forty-page opinion by the court. Defense counsel did not cite any particular page of the opinion, requiring this court to search through the opinion to locate the appropriate section.

action for the purpose of causing plaintiff harm because defendant Bennett was angry with plaintiff. Although defendant Bennett alleges that he did not slam the hatch on plaintiff's hand, he issued a misbehavior report stating that he "closed inmate Engles [sic] cell window to stop him from instructing inmate [T]." (Dkt. No. 33-3 at 4).

In *Beckford v. Portuondo*, a case also cited by defendants, the court held that if "an official uses force on an inmate for the purpose of causing the inmate harm, as the official lost his or her temper, that is a 'per se violation of the Eighth Amendment.'" *Beckford v. Portuondo*, 151 F. Supp. 2d 204, 216 (N.D.N.Y. 2001). Defendant Bennett argues that he closed the cell shield for the purpose of restoring order because plaintiff was being disruptive. While that may be true, if defendant Bennett intentionally closed the cell shield on plaintiff's hand because he was angry with plaintiff's behavior, then that could support an excessive force claim. In his response to the motion for summary judgment, plaintiff alleges that Bennett's actions led plaintiff "to believe [Bennett] was mad that he wanted to hurt & cause me pain." (Dkt. No. 84-3 at 3). Plaintiff also points out that defendant Bennett does admit that he closed the cell shield, just "not on [plaintiff's] fingers." This discrepancy raises a genuine issue of material fact that precludes granting summary judgment on the basis of the evidence submitted.

In *Reeb v. Irvin*, the district court denied summary judgment in a case in which plaintiff claimed that the defendant corrections officer slammed plaintiff's hand in the plexiglass "feed-up slot" without warning. *Reeb v. Irvin*, No. 96-CV-514, 2000 WL 914136, at *2 (W.D.N.Y. June 20, 2000). Plaintiff did not know whether defendant saw his hand in the slot prior to shutting the door. *Id.* In denying defendant's motion for summary judgment, the court rejected defendant's argument that there was no

constitutional violation because the injury was de minimis, finding correctly that such argument was an incomplete understanding of *Hudson*, and now, *Wilkins*. *Id.* at \*5. The court held that there were genuine issues of fact as to whether the defendant closed the feed-up hatch door on plaintiff's hand and whether such was necessary under the circumstances, in addition to whether plaintiff suffered a cognizable injury as a result of the defendant's conduct. *Id.* Similar questions of fact exist in this case.[6] The court does not necessarily question the need for defendant Bennett to shut the cell shield, however, there are questions of fact regarding how the door was shut, whether plaintiff's hand was in the door, and defendant's motivation for closing the door the way that he did. Thus, this court will recommend denying defendant Bennett's motion for summary judgment on the excessive force claim.

## IV.   Medical Care/Retaliation

### A.   Legal Standards

#### 1.   Medical Care

In order to state a claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter*, 316 F.3d 178, 183–84 (2d Cir. 2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the

_____

[6] In *Beckford*, the court stated that "it may turn out at trial that defendants . . . did not intentionally spray Plaintiff with their extinguishers but instead, in the confusion surrounding the fire, sprayed Plaintiff inadvertently. 151 F. Supp. 2d at 216. "If this is shown, Plaintiff's claim will fail." *Id.* However, the court determined that it was not "in a position to determine whether this in fact happened," and denied defendants' summary judgment motion.

defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing *inter alia Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

### a.    Objective Element

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin*, 467 F.3d at 279 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.* The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer*, 511 U.S. at 844-47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Id.* at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id.* (citing *Helling v. McKinney*, 509 U.S. 25, 32–33 (1993)). If the "unreasonable care" consists of a failure to provide ***any*** treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003)). However, in cases where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the issue is an unreasonable delay or interruption of ongoing treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith*, 316 F.3d at 185). The court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as

13

the basis for a constitutional claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* at 280.

### b. Subjective Element

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 300 (1991)). In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Id.* (citing *Farmer*, 511 U.S. at 835–37). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.* Deliberate indifference is equivalent to subjective recklessness. *Id.* (citing *Farmer*, 511 U.S. at 839–40).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance*, 143 F.3d at 702). The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance*, 143 F.3d at 702 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer*, 511 U.S. at 844. The court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin* 467 F.3d at 281.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). Plaintiff's preference for an alternative treatment or belief that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle v. Gamble*, 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id.; see also Daniels v. Williams*, 474 U.S. 327, 332 (1986) (noting that negligence is not actionable under § 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under § 1983.

### 2. Retaliation

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendant. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from

exercising . . . constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (citations omitted). The plaintiff must establish a causal connection between the protected conduct or speech and the adverse action. *Id.* at 380. The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. *Bennett*, 343 F.3d at 137.

### B. Application

#### 1. Medical Care

Plaintiff alleges that he did not receive medical care for his injured finger for approximately one and one half hours. (Compl. ¶ 10-11). Plaintiff claims that he showed defendant Bennett the injury to plaintiff's finger, allegedly caused when Bennett slammed the feed-up hatch door on his hand. (Compl. ¶ 8). Plaintiff states that he then requested medical care and to speak with an OMH counselor from defendant Bennett, who allegedly refused. (Compl. ¶¶ 8, 9). Plaintiff claims that he was seen by an unidentified nurse who told plaintiff that his cut was superficial and that it only needed to be cleaned and bandaged. (Compl. ¶ 11). Plaintiff states that he believes that the nurse was "instructed" by DOCCS to downplay the seriousness of his injury in order that the injury would not be properly recorded and could be kept "in-house." (*Id.*) Plaintiff claims that this unidentified nurse "waived all professional judgment."[7] (Compl. ¶ 11).

The plaintiff was taken back to his cell, but did not comply with orders to

---

[7] This nurse was never identified, never served, and is not a defendant in this action.

surrender the handcuffs which had been placed on his wrists. (Compl. ¶ 15). He subsequently saw an OMH nurse and an OMH counselor, neither of whom is a defendant in this action. (Compl. ¶¶ 15-17). Plaintiff stated that he wished to go to a "strip cell" because he was going to hurt himself. (Compl. ¶ 16). Plaintiff stated that, after two hours of waiting, officers came to take plaintiff to the strip cell, and he gave the officers the handcuffs. (Compl. ¶ 18).

Plaintiff alleges that defendant Dougherty came to the strip cell later on the day of the incident to give plaintiff his pain medication, and plaintiff showed defendant Dougherty his finger, "asking him for his medical decision regarding such and to do the right thing in helping me get it treated properly." (Compl. ¶ 18). Nurse Dougherty allegedly asked plaintiff what the previous nurse said, and plaintiff replied that the previous nurse told plaintiff that the wound was only superficial. (Compl. ¶ 19). Plaintiff told defendant Dougherty that his finger "clearly" needed stitches, and defendant Dougherty allegedly stated that "well now you want me to help you after all those times you wrote me up in your grievances." (Compl. ¶ 19). Plaintiff was ultimately sent to an outside hospital for stitches after showing his finger to another nurse on the 11 p.m. to 7 a.m. shift. (Compl. ¶ 25). Plaintiff claims that the doctor at the outside hospital told plaintiff that the cut on his finger was not superficial. (*Id.*)

It is not clear whether plaintiff is claiming that defendant Bennett denied plaintiff proper medical care. Plaintiff does state that he "showed" defendant Bennett what he did to plaintiff's finger, but that defendant Bennett denied plaintiff's request to "be seen by medical" and to speak with an OMH counselor. (Compl. ¶ 8, 9). Plaintiff alleges that he "screamed" for over an hour, and that he finally had to jam a hard cover book in

his feed-up window so that the officers would pay attention to him. (Compl. ¶ 10). Plaintiff concedes that he was taken to the nursing station thirty minutes later. (Compl. ¶ 33).

Because plaintiff is claiming a delay in care and a disagreement with the care that was ultimately provided, the objective inquiry relates to the challenged delay itself, rather than on the underlying condition alone. *Smith v. Carpenter, supra*. At most, in this case, plaintiff's medical care was delayed for one and one half hours. Plaintiff then disagreed that the appropriate care was simply to wash and bandage the wound. He has not sued the Jane Doe nurse who he claims "waived her professional judgment" by failing to order stitches.

Defendant Dougherty arrived later in the day, and according to plaintiff, asked him what the prior nurse had recommended. While plaintiff alleges that defendant Dougherty became "sarcastic" and implied that he was not helping plaintiff because plaintiff had filed grievances against him, it does not change the fact that the nurse who examined plaintiff shortly after the incident determined that plaintiff did not need stitches. Nurse Dougherty's agreement with the care provided, and his disagreement with the plaintiff's assessment of his injury, does not rise to the level of deliberate indifference. At most the Jane Doe nurse and defendant Dougherty could have been negligent in failing to order stitches for plaintiff, but that conduct does not rise to the level of a constitutional deprivation.

Defense counsel has submitted some of the plaintiff's psychiatric progress notes, dated from December 30, 2011 until February 3, 2012. (Dkt. No. 34). On December 30, there are several entries, indicating that plaintiff was examined at least three times

during the day. (Dkt. No. 34 at 4-6). Plaintiff spoke to OMH personnel at 2:45 p.m., 4:00 p.m., and 7:30 p.m. The 4:00 p.m. progress note states that plaintiff "feels [he] has not received proper medical treatment. Threatening self harm and harm to others." (Dkt. No. 34 at 5). Defendant Dougherty was not the only person on the medical/mental staff that saw plaintiff during the day. At 7:30 p.m., plaintiff admitted pulling apart the skin on his cut so that he would be taken to the hospital.[8] (Dkt. No. 34 at 6). The nurse informed his/her superior of "what was happening." (*Id.*)

Plaintiff may be arguing that the fact that he was ultimately taken to the hospital later that night and was given two stitches shows that defendant Dougherty was deliberately indifferent to his injury. However, a review of the hospital records, submitted by plaintiff in opposition to defendants' motion shows that the injury was labeled "non-urgent," plaintiff told the medical personnel at the hospital that he cut his finger "on a fence," and that the laceration was "glued" at the facility. (Pl.'s Ex. A at CM/ECF p.21). The Emergency Department Record also states that "PT kept bending the finger and removed the glue." (*Id.*) Plaintiff also admitted to a "self-inflicted" laceration.[9] (*Id.*) The hand and wrist examination were "normal without areas of visible trauma, including the elbow, upper arm and shoulder . . . with no apparent injury or focal tenderness." (*Id.*) The medical records indicate that plaintiff's wound was addressed at the facility, but plaintiff bent the finger and picked at the wound until he

---

[8] The signature on this note is illegible, but the note states that it is an RCTP Nursing Progress Note. (Dkt. No. 34 at 6).

[9] It is not clear whether plaintiff was referring to the injury itself or whether plaintiff was admitting that he made the injury worse by bending his fingers and opening and closing the wound. Certainly, that was "self-inflicted."

was taken to the outside hospital, and stitches were administered to close the wound that he made worse.

In his response to the defendants' motion for summary judgment, plaintiff states that defendant Dougherty had plaintiff remove his bandage when plaintiff asked him about the laceration in the afternoon. (Dkt. No. 84-3 at 4). Plaintiff states that the injury had been "cleaned and wrapped." (*Id.*) Plaintiff claims that they had "back and forth discussions," and then defendant Dougherty refused to "reclean or cover" plaintiff's cut so that it did not get infected. If plaintiff later got his wound dirty or picked at the cut, resulting in the night nurse deciding that plaintiff should be taken to the hospital for stitches, plaintiff cannot blame the facility staff or defendant Dougherty for plaintiff's own destructive behavior. The plaintiff's own exhibits do not support his claim. Thus, plaintiff's medical care claim may be dismissed.

## 2.    Retaliation

Plaintiff alleges that defendants' action were in retaliation for unidentified grievances that he allegedly filed. Since the only allegation against defendant Bennett is that he used excessive force in slamming the cell shield on plaintiff's hand, plaintiff can only be claiming that this act was retaliatory. However, plaintiff does not specify what grievances he filed against defendant Bennett or when he filed them. Retaliation for "unspecified grievances" is not sufficient to state a claim for retaliation. *Guillory v. Haywood*, No. 9:13-CV-1564, 2015 WL 268933, at *23 (N.D.N.Y. Dec. 11, 2014), (Rep't-Rec.), *adopted*, 2015 WL 268933, at *1 (N.D.N.Y. Jan. 21, 2015). *See also Barnes v. Monroe County*, 85 F. Supp. 3d 696, 733 (W.D.N.Y. 2015) (citing *Shariff v. Poole*, 689 F. Supp. 2d 470, 479 (W.D.N.Y. 2010)) (Dismissing retaliation claim where

plaintiff did not allege when the underlying grievances were filed that caused the retaliation).

To the extent that the complaint may be read as alleging that defendant Bennett was retaliating against plaintiff for "advising" Inmate T of his "rights," it has been held that "[c]omplaining aloud to corrections officers about the treatment of another inmate while that inmate is being forcibly removed from his cell is not [constitutionally protected activity under the First Amendment]." *Nevares v. Morrissey*, No. 95-CV-1135, 1999 WL 760231, at *6 (S.D.N.Y. Sept. 27, 1999) (citing *Rodriguez v. Phillips*, 66 F.3d 470, 478-79 (2d Cir. 1995)). Plaintiff does not address this issue in his response to defendants' motion for summary judgment, and it is clear from the complaint that plaintiff was attempting to "interfere" in the movement of Inmate T, even though plaintiff views his actions as informing Inmate T of his rights. Thus, plaintiff's retaliation claim as against defendant Bennett should be dismissed as conclusory.

The facts are slightly different as to defendant Dougherty. Plaintiff still does not allege what grievances he filed against this defendant or when those grievances were filed. However, plaintiff alleges that defendant Dougherty referred to the alleged grievances when he was denying plaintiff his desired medical care. However, based on the discussion above, the plaintiff cannot show an "adverse action" in defendant Dougherty's case. At worst, defendant Dougherty negligently agreed with the previous nurse, who determined that plaintiff's cut was superficial and denied plaintiff additional care because he did not think it was required. Plaintiff also claims that defendant Dougherty should have known not to leave the asthma pump with plaintiff because

plaintiff would try to injure himself with it.

Defendants have submitted plaintiff's mental health records for the day of the incident and the following days. At 7:30 p.m. on December 30, 2011, the OMH nurse who checked on plaintiff noted that "[h]e has a superficial scratch to his left wrist and pulled apart the skin on his cut on his left finger. He stated that he did it because he wants to see a Dr. about his finger and he did this to get to the hospital. Not sent to the hospital. Very angry and continues to threaten to cut up further." (Dkt. No. 34 at 6). Plaintiff also threatened to "swallow" until he was taken to the hospital. (*Id.*) This is consistent with plaintiff's exhibit which shows that he "kept bending the finger" until the "glue" that the facility used to close the laceration came off. (Dkt. No. 84-4). Plaintiff also admitted self-inflicting the laceration.[10] There is no evidence of "adverse action" by defendant Dougherty even if the fact that he allegedly mentioned "grievances" filed by plaintiff is accepted as true. Thus, any retaliation claim may be dismissed.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 33) be **DENIED** only with respect to the **excessive force** claim as against defendant **BENNETT**, and it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 33) be **GRANTED** in all other respects, and the complaint dismissed in its entirety as against defendant **DOUGHERTY**.

---

[10] Plaintiff cannot transform defendant Dougherty's conduct into adverse action by intentionally harming himself.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: March 9, 2017

Hon. Andrew T. Baxter
U.S. Magistrate Judge